## UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | *ROBERT W. GETTLEMAN* | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | *99 C 735* | Date | *October 20, 2000* |
| Case Title | MorEquity Inc.    v    Abdul Naeem, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]

(2) ☐ Brief in support of motion due _____

(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____

(4) ☐ ☐ Ruling/Hearing on _____ set for _____ at _____

(5) ☐ Status hearing ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____

(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____

(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____

(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____

(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) ■ [Other docket entry]    Memorandum opinion and order entered.
Accordingly, Fremont's motion to dismiss the cross-claim is granted as to counts II
through VII and is denied as to count I.  MorEquity's motion to dismiss the counterclaim
is granted as to counts II,III,V,VI anfd VII and denied as to counts I and IV.
Land Title's and Buczkowski's motion to dismiss the third party complaint is granted.

(11) ■ [For further detail see ☐ order on the reverse of ■ order attached to the original minute order form.]

| | | |
|---|---|---|
| ☐ No notices required, advised in open court. | | number of notices |
| ☐ No notices required. | | |
| ■ Notices mailed by judge's staff. | | date docketed |
| ☐ Notified counsel by telephone. | FILED FOR DOCKET  OCT 2 4 2000 | |
| ☐ Docketing to mail notices. | 00 OCT 23   AM 11:28 | docketing dpty. initials |
| ☐ Mail AO 450 form. | | date mailed notice |
| ☐ Copy to judge/magistrate Judge. | | |
| courtroom deputy's Initials | Date/time received in central Clerk's Office | mailing dpty. initials |

Document #
120

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MorEquity, INC.,                           )
                                           )
            Plaintiff,                     )
                                           )
            v.                             )     No.    99 C 735
                                           )
ABDUL NAEEM, SALLY S. NAEEM, PRAIRIE       )     Judge Robert W. Gettleman
VILLAGE TOWNHOME ASSOCIATION,              )
FREMONT INVESTMENT & LOAN, and             )
UNITED STATES OF AMERICA,                  )
                                           )
            Defendants.                    )
_____)
                                           )
ABDUL NAEEM and SALLY S. NAEEM,            )
                                           )
    Counter/Cross/Third-Party Plaintiffs,  )
                                           )
            v.                             )
                                           )
MorEquity, INC.,                           )
                                           )
    Counter-Defendant,                     )
                                           )
FREMONT INVESTMENT & LOAN,                 )
                                           )
    Cross-Defendant,                       )
                                           )
THERESA MILLER, LAND TITLE GROUP,          )
INC., and CAROL BUCZKOWSKI,                )
                                           )
    Third-Party Defendants.                )

OCT 2 4 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff MorEquity, Inc. ("MorEquity"), brought a mortgage foreclosure action in the

Circuit Court of Cook County, Illinois, against defendants Abdul and Sally Naeem (the

"Naeems"), Prairie Village Townhome Association, Fremont Investment & Loan ("Fremont")



and the United States, seeking a judgment of foreclosure and sale of the Naeems' home. The Naeems removed the case to this court and filed: 1) a counterclaim against MorEquity alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the Illinois Interest Act, 815 ILCS 205/4.1a; 2) a cross-claim against Fremont for fraud, violating the Illinois Consumer Fraud and Deceptive Business Practices Act ("consumer fraud") and the Illinois Interest Act; 3) a third party complaint against Land Title Group, Inc., and its employee Carol Buczkowski for fraud, consumer fraud and violating the Illinois Notary Act, 5 ILCS 312/7-101; and 4) a third party complaint against Theresa Miller, a mortgage broker.

On January 12, 2000, the court dismissed the Naeems' fraud and consumer fraud claims against Fremont because they were based entirely on a conclusory allegation that Miller was acting as Fremont's agent when she allegedly made material misrepresentations to induce the Naeems to enter into the mortgages in question. Because the Naeems had argued that the information needed to assert the claims properly was exclusively within Fremont and Miller's control, the court granted the Naeems leave to replead the fraud claims against Fremont.

Also on January 12, 2000, the court dismissed all claims against Land Title and Buczkowski because they were not proper third party defendants. Because the Naeems' claims against Land Title and Buczkowski were not dependent on nor secondary to MorEquity's foreclosure action against the Naeems, they were not properly brought under Fed. R. Civ. P. 14. The fraud claims against Land Title, however, were pled as part of the same claims brought in the cross-claim against Fremont.[1] Therefore, if the Naeems' elected to replead fraud against

---

[1] The counterclaim, cross-claim and third party complaint were set forth in one document in which the claims against the counter/cross and third party defendants were lumped together.

Fremont, the court noted that the Naeems could move to add Land Title as an additional defendant under Fed. R. Civ. 13(h) and 19. Once Land Title was properly named as a defendant in the cross-claim, the Naeems could then bring in any additional claims they had against Land Title and could join any defendant that was potentially liable under those claims.

The Naeems elected to replead, and on June 30, 2000, filed: 1) and amended counterclaim against MorEquity alleging a quiet title action, various violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638, and violations of RESPA and the Illinois Interest Act; 2) an amended cross-claim against Fremont seeking to quiet title and alleging slander of title, fraud and consumer fraud, and violations of the Illinois Interest Act. The amended cross and counterclaims also attempt to assert class claims for violations of the Consumer Fraud Act, Illinois Interest Act, and TILA. Rather than take the court's suggestion and add Land Title to the cross-claim, however, the Naeems elected to once again file a separate amended third party complaint against Land Title, Buczkowski and Miller, alleging slander of title, fraud and consumer fraud and (against Buczkowski and Land Title only) breach of fiduciary duty, negligence and violations of the Illinois Notary Act.

Fremont, MorEquity, and Land Title and Buczkowski have all moved to dismiss all claims against them. For the reasons set forth below, the motions are granted in part and denied in part.

3

## Facts[2]

Plaintiffs Abdul and Sally Naeem purchased a single family townhome in Aurora, Illinois in fee simple as joint tenants in September 1995, by borrowing $113,400 at an interest rate of 8.25% from Prism Mortgage Company. The loan, secured by a mortgage on the property, was later assigned to Mellon Mortgage Company (the "Mellon Mortgage"). As of September 1997, the principle balance on the Mellon Mortgage was approximately $111,000. The Mellon Mortgage was a first lien on the property, which had an appraisal value of $140,000. According to the complaints, the Naeems are immigrants from non-English speaking countries and unsophisticated borrowers. Mr. Naeem asserts that he can speak conversational English but has difficulty reading and understanding documents related to complicated financial transactions.

The Naeems own and operate a limousine business in which Mr. Naeem uses his own limousine. Sometime in the late summer of 1997 the limousine was damaged and required several thousand dollars of repairs. As a result, the Naeems needed a home equity loan to enable them to repair the limousine. At that time they saw an advertisement by Consumer Security Mortgage ("CSM"), an Illinois mortgage brokerage firm. Abdul contacted CSM and Theresa Miller and requested a $5,000 loan. Miller told Abdul that he would be required to borrow $20,000 because the lender would require that as a condition of the loan the Naeems pay off their credit card balances in the approximate amount of $10,900. Mr. Naeem argued that he needed only $5,000, but because of his emergency and allegedly based on Miller's statements about the conditions for the loan, Abdul reluctantly agreed to a $20,000 loan.

---

[2]The facts are taken from the allegations of the cross, counter, and third party complaints, which are taken as true for purposes of the motion to dismiss.

4

Miller completed a handwritten application for loan in that amount. Miller submitted the application to Fremont, which had developed and advertised to brokerage professionals a consumer loan program called the "95% Combined Loan-To-Value Stated Income" program. This program provided and required that borrowers could obtain home equity loans only if they also made a mortgage with Fremont for 75% of the value of their home. If the borrower made such a mortgage, Fremont would also make a loan to that borrower of up to an additional 20% of the value of the borrower's home. Fremont had advertised this program to CSM through a flyer, and then in early September, Fremont's Fred Scola visited CSM and had a sales solicitation meeting in which he described and explained the program. The Naeems allege that Miller completed an application form in her own handwriting with the express intent to submit that application for a $20,000 loan to Fremont under the 95% Combined Loan-To-Value Stated Income program. She submitted that application to Fremont's Chicago office by facsimile transmission the same day that she spoke with Mr. Naeem.

Shortly thereafter, Miller was telephoned by an employee in Fremont's Chicago office who told her that to participate in Fremont's advertised 95% Combined Loan-To-Value Stated Income program the Naeems would be required to refinance their existing mortgage. The Fremont employee also told Miller that Fremont would not loan Mr. Naeem $20,000 on a second mortgage without also refinancing the Naeems' existing mortgage.

Miller then spoke again by telephone with Abdul Naeem, and told him what she had been told by the Fremont employee. He protested, claiming that he needed only a $5,000 loan. Miller repeated to him that Fremont would not loan him that amount, or even $20,000, unless he refinanced his existing mortgage pursuant to the 95% Combined Loan-To-Value Stated Income

program. According to the Naeems, Miller told them that they were required to refinance their entire first mortgage, that they did not have verifiable income because they were self employed and, therefore, were considered a higher credit risk, and they would be unable to find financing from any other source.

The Naeems allege that because of Miller's pressure and the emergency need for funds to repair the limousine, Mr. Naeem reluctantly agreed to refinance his existing mortgage. Therefore, Miller made application to Fremont for two loans, one for $105,000 and the other for $28,000. Miller completed the new application papers for the two loans and submitted them to Fremont for approval. After the approval, Fremont prepared all loan documents including loan escrow instructions for Land Title. As part of the transaction, Fremont required that Mrs. Naeem quitclaim her one-half undivided joint tenancy ownership to her husband. This requirement was and is a part of Fremont's custom and practice of requiring one co-owner to quitclaim his or her interest to the other co-owner who would be the obligor on the notes.

At the end of September 1997, Miller informed the Naeems that their loan application had been approved and instructed them to meet her at the Land Title office to close the loan. On September 30, 1997, Miller went to Fremont's Chicago office, picked up the "closing package" of documents that had been allegedly prepared by Fremont's internal Chicago staff. She carried those mortgage papers and other documents to Land Title for the closing.

The Naeems met Miller at Land Title and began the closing. When Mr. Naeem discovered that he would be required to pay what he terms exorbitant and excessive loan fees, he refused to sign any papers, refused to close the loan, and left the Land Title office.

Over the succeeding days, Miller and CSM repeatedly contacted Mr. Naeem in an "effort to force him into these punitive and unfair loan transactions." Believing that the only way that he would be able to obtain the $5,000 to repair his limousine was to refinance their existing mortgage as required by Miller, CSM and Fremont, the Naeems agreed to take out the two loans pursuant to the Fremont 95% Combined Loan-To-Value Stated Income program.

On October 9, 1997, the Naeems again met Miller at Land Title to close the two loans. During the closing Abdul was presented with a stack of papers and was instructed to sign without any knowledge or understanding of what those papers purported to be. Sally Naeem was also instructed to sign some of the papers presented to her. Her signature was obtained without any explanation of the papers or their legal force and effect.

According to the complaints, the completed Fremont documents relating to the $28,000 loan financed approximately $27,315 at an annual percentage rate of 13.99%, in 179 monthly payments of $331.55 and one balloon payment of $25,234.78, for total payment of $84,582.23. The documents obligated the Naeems to pay a total finance charge of approximately $57,267 over the life of the loan.

The completed documents relating to the $105,000 loan financed the amount of approximately $99,736 at an annual percentage rate of 10.99% at 360 monthly payments of $999.15 for total payments of $359,264. The documents obligated the Naeems to pay a total finance charge of approximately $259,958. At closing Mr. Naeem was required to and did sign two new loan applications. Both loans are secured by mortgages obtained by Fremont on the Naeems' residential real estate.

During the closing, Sally Naeem was informed that a quitclaim deed was required, transferring her interest in the property to her husband. Someone, either at Fremont or CSM, prepared a quitclaim deed purporting to transfer Sally's interest in the property to Abdul. The deed indicates that it was prepared by Abdul. Sally refused to sign the quitclaim deed, and alleges that the signature on the deed purporting to be hers is a forgery.

After the October 1997, closing, the quitclaim deed was then altered, allegedly by an unknown employee or agent of Land Title, by the addition of the following language: "subject to the mortgage of September 30, 1997, recorded October 27, 1997, as Document No. R97-162957." The deed was recorded without an acknowledgment of a notary public, although third party defendant Buczkowski allegedly partially filled in the blanks in the notary certification. The deed was recorded with the DuPage County Recorder of Deeds on November 3, 1997, as Document No. R97-167161. Sometime thereafter, Buczkowski obtained a copy of the deed and affixed a fraudulent notary certificate, falsely attesting that Sally Naeem's signature was genuine.

The mortgage on the $28,000 loan was recorded with the DuPage County Recorder of Deeds on October 27, 1997, as Document No. R97-162957. Because the Mellon Mortgage remained of record, the $28,000 mortgage constituted a second lien on the property. The mortgage on the $105,000 loan was recorded on November 3, 1997, as Document No. R97-167162. According to the Naeems, as the later recorded instrument subordinate to the Mellon Mortgage and the $28,000 mortgage, the $105,000 mortgage constituted a third lien on the Naeems' residential property.

Fremont ultimately sold or transferred the $28,000 mortgage to The Associates, Ltd. On December 22, 1997, Fremont sold or transferred the $105,000 mortgage to MorEquity. On or

8

about October 29, 1997, the Mellon Mortgage was paid in full, and on July 22, 1998, a release of that mortgage was recorded as Document No. R98-146617, resulting in an advancement of the priority of the two Fremont mortgages, with the $28,000 mortgage becoming the first lien and the $105,000 mortgage becoming the second lien.

## Discussion

Although each of the counter, cross, and third party defendants (except Miller) have filed separate motions to dismiss, many of the asserted defenses and legal arguments overlap. Because most of the Naeems' claims stem from their attack on how the initial loans were issued, the court begins with the motion by Fremont ( the original lender) to dismiss cross-claim.

I. Fremont

A. Count I - Quiet Title

In Count I, styled "Quiet Title to Remove Cloud on Title," the Naeems seek an order declaring the allegedly fraudulent deed to be a nullity, canceling the record of the forged deed and declaring that title remains and has always been held by Abdul and Sally in fee simple as joint tenants. They also seek an order declaring the $105,000 MorEquity mortgage and $28,000 mortgage invalid as to any interest in the property. Fremont does not argue that the allegations that a forged deed was recorded are insufficient to state a claim for quiet title, but does argue that the remedy for any such violation would be simply a declaration that the quitclaim deed is invalid. An invalid quitclaim deed, according to Fremont, does not void the otherwise legally enforceable first and second notes and mortgages that the Naeems signed. Therefore, Fremont has moved to strike the prayer for relief to the extent it seeks a declaration of invalidity of the mortgages.

9

Neither party has submitted any legal authority on the appropriate remedy under the circumstances alleged. Because the Naeems ' claim asserts that the forged quitclaim deed was created and recorded as part of a single underlying transaction, and because it is undisputed that Count I states a claim for quiet title, the court denies the motion to strike the prayer for relief without prejudice.

### B. Count II - Slander of Title

In Count II, the Naeems allege that Land Title and Buczkowski acted as Fremont's agent in closing the loans and recording the forged quitclaim deed. Fremont argues that the cross-claim alleges no facts to support the Naeems' conclusory allegation that Land Title and Buczkowski were acting as Fremont's agents when they allegedly recorded the forged document or notarized a copy of the forged document. Fremont also argues that Count II fails to allege the necessary elements of the claim.

To state a claim for slander of title, a plaintiff must allege a false and malicious oral or written publication that disparages a person's title to property resulting in special damages. Contract Development Corp. v. Beck, 255 Ill.App.3d 660, 665 (2d Dist. 1999).[3] To demonstrate malice, a plaintiff must show that the defendant knew the disparaging statements were false or that the statements were made with reckless disregard as to their truth or falsity. Id.

Fremont argues that the Naeems have not and cannot plead special damages. Fed. R. Civ. P. 9(g) requires that items of special damages "shall be specifically stated." The Naeems, recognizing that they have not set forth any special damages in the cross-claim, argue instead that

---

[3]The parties agree that Illinois law applies to the state law claims pursuant to Erie R.R. Co. v. Thompkins, 304 U.S. 64 (1938) and its progeny.

special damages were incurred by the mere fact that a fraudulent deed was recorded. In Whildin v. Kovacs, 82 Ill.App.3d 1015, 1016 (1st Dist. 1980), the court stated that "the act of maliciously recording a document that clouds another's title to real estate is actionable as slander of title." The court made that statement, however, as part of its discussion of the malice requirement, which was the issue before the court. Id. Neither Whildin, nor any other Illinois court of which this court is aware, has ever held that recording a false document is a per se violation. Indeed, Whildin cites to 39 ALR 2d 840 (1955), which compiles cases from other jurisdictions holding just the opposite. Because the Naeems have not alleged any special damages, the cross-claim fails to state a claim for slander of title. Count II is dismissed.

C.   Counts III, IV and V - Illinois Consumer Fraud and Fraud

In Counts III and IV, the Naeems allege individual and class claims for violation of the Consumer Fraud Act. Count V alleges common law fraud. Counts III and V (the individual claims), allege that Fremont violated the Consumer Fraud Act and committed common law fraud by: a) failing to provide a written statement of the reasons for denying the Naeems' original $5,000 loan request or the original $20,000 loan application; b) refusing to loan the Naeems the small amounts of funds requested without refinancing their first mortgage; c) procuring and recording a forged and fraudulent quitclaim deed; and d) taking advantage of these deceptions and the Naeems' lack of sophistication and immigrant status to exact oppressive interest and fees at closing. Count III also alleges that Fremont prepared false and incomplete disclosure statements and included fees for the smaller loans in the fees for the larger loan in violation of applicable federal law.

11

Fremont initially challenges the Consumer Fraud Counts (III and IV), arguing that they are time barred and fail to state a claim for loan splitting. Fremont describes the counts as alleging that the two loans "constituted only one transaction" and that Fremont violated TILA disclosure requirements by providing the Naeems with two disclosure statements instead of one. Thus, Fremont asserts that the counts, brought under the Consumer Fraud Act, are simply disguised TILA claims. Because TILA has a one year statute of limitations, Fremont argues that the counts are time barred.

It is true, as Fremont asserts, that the Consumer Fraud Act does not extend disclosure requirements beyond those already required by the federal disclosure statutes. Compliance with TILA is a defense to liability under the Consumer Fraud Act. Lainer v. Associates Financial Inc., 114 Ill. 2d 1 (1986). Thus, when a creditor is exempt from TILA liability, the creditor is also exempt from Consumer Fraud Act liability. Jackson v. South Holland Dodge, Inc., 312 Ill.App.3d 158, 167 (1st Dist. 2000).

Jackson and Lainer hold only that Illinois law does not impose greater disclosure requirements than those mandated by federal law. Lainer, 114 Ill.2d at 17; Jackson, 312 Ill.App.3d at 167. Compliance with federal law is sufficient disclosure. In the instant case, Fremont seeks to equate compliance with the substantive provisions of TILA with compliance with TILA's one year procedural requirement. Fremont is not arguing that it has complied with all of TILA's disclosure requirements, only that the Naeems have not brought suit within TILA's one year statute of limitations. The Consumer Fraud Act, however, has a three year statute of limitations (815 ILCS 505/10a(e)), and applying that three year statute does not impose

12

disclosure requirements greater than those mandated by federal law. Because the Naeems' claim is brought within the three years of the date it accrued, it is not time barred.

Fremont next argues that the Naeems have failed to allege a claim for loan splitting. More specifically, Fremont argues that the Naeems have pled themselves out of a loan splitting claim by specifically alleging that Abdul requested, applied for, and received two separate loans. Loan splitting is defined as a situation where the debtor "wanted, requested, and expected to receive a single loan, consummated in one transaction, but [the lender] documented and made disclosure for the loan as if it were two separate transactions." In re Buckles, 189 B. R. 752, 760 (D. Minn. 1995); Vance v. National Benefit Assoc., 1999 WL 731764 (N.D. Ill. Aug. 30, 1999). Loan splitting violates TILA (and thus the Consumer Fraud Act) because "the giving of two separate disclosure statements for a single loan transaction is a violation of TILA's requirement of a single, comprehensible disclosure of the cost of credit." Id.

In response to Fremont's motion, the Naeems argue that "[t]he issue of whether one transaction or two transactions occurred is a factual determination and thus can not be resolved on a motion to dismiss." Id.; citing Buckles, 189 B.R. at 752; Hemauer v. ITT Financial Services, 751 F. Supp. 1241 (W.D. KY 1990). While that statement is true, however, it is not inconsistent with the Seventh Circuit's general rule that plaintiffs can plead themselves out of court by alleging facts that show that they have no claim, even though they were not required to plead those facts. Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995). "Allegations in a complaint are binding admissions, and admissions can of course admit the admittor to the exit from the federal courthouse." Id. (citations omitted).

In the instant case, under the notice pleading standard of the Federal Rules of Civil Procedures, the Naeems could have alleged simply that Abdul went into the October 9, 1997, closing wanting and expecting to receive a single loan consummated in one transaction, but instead ended up entering into two loans. The Naeems elected not to do so, providing factual allegations that, as Fremont argues, demonstrate just the opposite. The cross-claim very clearly alleges that Miller told Abdul that Fremont would not loan him $20,000 on a second mortgage without also refinancing the Naeems' existing mortgage, and that because of Miller's pressure and the emergency need for funds to repair his limousine, Abdul reluctantly agreed to refinance his existing mortgage. Therefore, Miller made application to Fremont for two loans, one for $105,000 and the other for $28,000. Indeed, despite allegations of their being immigrants from non-English speaking countries and unsophisticated borrowers, Abdul, when presented with the two sets of loan documents, walked out of the first closing because he believed he was being charged excessive fees not properly disclosed. Nevertheless, he agreed a second time to enter into a refinancing of his existing mortgage.

The key inquiry is "what was the parties' original agreement as to the nature, number, and purpose of the contemplated extensions of credit." Buckles, 189 B.R. at 760. There are a number of factors relevant to the analysis, including:

1. the debtor's purposes in applying for credit and the needs he was seeking to meet by obtaining financing;

2. the debtor's expectation as to the number and sequence of financial commitments he would make in order to obtain the funds he sought to borrow;

3. the means, length and clarity of the creditor's communications to the debtor about its proposals for loan terms;

14

4.   the creditor's internal policies and controls for structuring
     extensions of credit, particularly with reference to initial
     "enabling" loans to finance the costs of application for a larger
     loan;

5.   the extent to which the creditor's employee articulates such
     policies to the debtor as a justification for structuring a loan in a
     particular way; and

6.   the nature an result of any bargaining or negotiation on loan
     amounts and terms that went on between the parties.

Id. at 761. In every case, however, the most important consideration is the debtor's awareness

and intent, both before the creditor made its commitment and when the debtor assented, tacitly or

explicitly, to the way in which the creditor structured the loan. Id., citing Hemauer, 751 F. Supp.

at 1243-44.

In the instant case, it is clear from the allegations of the cross-claim that Abdul Naeem

knew at all times he was entering into a two loan transaction. Indeed, as mentioned above, he

had seen the way the deal was structured at the first closing and walked out. The cross-claim

clearly alleges that Fremont's position was always that it would not loan the Naeems the funds

requested without also a refinance agreement. The Naeems knew this from the very start of

negotiations and elected to go forward. While the manner in which Miller and CSM convinced

the Naeems to go forward may in some way be actionable, based on the admissions in the cross-

claim, there was no loan splitting and thus no TILA violation. Absent a TILA violation, Count

III fails to state a Consumer Fraud Act claim based on loan splitting.

Counts III and V, however, allege more that loan splitting. The counts also allege that

Fremont violated the Consumer Fraud Act and committed common law fraud by misrepresenting

certain material facts and concealing others. Because the Naeems do not allege that they had any

direct contact with Fremont, they assert that the misrepresentations and omissions were made by Miller acting as Fremont's agent. In the January 12, 2000, order, the court held that the Naeems' conclusory allegations that Miller was acting as Fremont's agent were insufficient upon which to base a fraud claim. The Naeems have repled, and Fremont again argues that the agency allegations fail to meet the particularity requirements of Fed. R. Civ. P. 9(b).

Recently, in Lachmund v. ADM Investor Services, Inc., 191 F.3d 777 (7th Cir. 1999), the Seventh Circuit held that the federal rules require agency to be pled with particularity only when the plaintiff "relies on the same circumstances to establish both the alleged fraud and the agency relationship." Id at 783. The Naeems have alleged few facts to establish that Miller acted as Fremont's agent. The amended cross-claim first alleges that Fremont had developed the "95% Combined Loan- To- Value Stated Income" program which it was advertising to mortgage professionals in Illinois. Fremont advertised the program through a written flyer that it distributed to mortgage professionals including CSM and Miller. Fremont did not advertise the program directly to the public (the flyer indicated that it was not to be distributed to the public). Sometime in early 1997, Fremont sent Fred Scola to CSM, where he held a sales solicitation meeting describing the program. Miller received the flyer and kept it in a binder. According to the cross-claim, Fremont was the only lender offering such a program. Apart from the specific allegations relating to the Naeems' loan, which do not demonstrate agency, there are no other factual allegations showing any relationship between Fremont and Miller.

Relying on Lachmund, the Naeems argue that they need only plead agency generally, rather than with the particularity required by Rule 9(b). They are wrong. In Lachmund, like the instant case, the plaintiff alleged fraud by a principal through the actions of an agent. The court

held that where the plaintiff relies on the same circumstances to establish both the alleged fraud and the agency relationship, the reasons underlying Rule 9(b) apply with equal force to the two issues. Id. at 783. As in the instant case, the plaintiff in Lachmund had relied on general "conspiracy" allegations to allege an agency relationship. This court, like the Lachmund court, holds that such general allegations do not contain the requisite particularity to show that Fremont had "vested actual or apparent authority in" Miller, CSM, nor any other entity to act on its behalf. That leaves the Naeems relying on "the substantive allegations of fraud to establish the agency relationship." Id. Those allegations, although particular as to the events surrounding the closing of the loan, contain no particularity as to the relationship between Fremont and Miller. Accordingly, the court concludes that Counts III and V fail to state a claim for consumer fraud and common law fraud, respectively.[4] Because the Naeems cannot state a claim for consumer fraud, they are disqualified from acting as class representative for the class they seek to represent on Count IV. Count IV, like Counts III and V, is therefore dismissed. Cowen v. Bank United of Texas, FSB, 70 F.3d 937, 941 (7th cir. 1995).

D. Counts VI and VII - Illinois Interest Act

In Counts VI and VII the Naeems allege that because the $105,000 loan had an interest rate in excess of 8% and required prepayment of finance charges or "points" in excess of 3% of the principal amount, it violated the Illinois Interest Act, 815 ILCS 205/4.1. The counts further

---

[4]Even if the Naeems could plead agency, the counts also fail substantively as Fremont correctly notes: 1) it was not required to provide a written statement of the reasons for denial of the original $5,000 loan request (no application for a $5,000 loan was ever made) or for the $20,000 loan because it extended a counteroffer which the Naeems accepted. See 15 U.S.C. § 1691(d); 12 C.F.R. § 202.2(c); and 2)the court has already held that the Naeems have failed to allege loan splitting.

charge that the loans violated the Act by charging a 6% late fee, in excess of the 5% statutory maximum.

Fremont argues that § 521 of the Depository Institutions Deregulation and Monetary Control Act ("DIDMCA"), 12 U.S.C. § 1831d, preempts state law and allows Fremont to export the usury laws of a depository institution's home state. Thus, Fremont argues that § 521 allows it to export California's more favorable interest rate and late fee laws.

The Naeems respond that the claims are not preempted because: 1) Fremont is "located" in Illinois because it maintained an Illinois branch which made the loans; 2) the loan documents choose Illinois law; and 3) exportation of California "non-prohibition" of such charges would constitute "sister state preemption," an unconstitutional delegation of congressional power to the states.

Section 521 of DIDMCA, 12 U.S.C. § 1831d(a), provides in relevant part:

> In order to prevent discrimination against State-chartered insured depository institutions . . . if the applicable rate described in this subsection exceeds the rate such state bank . . . would be permitted to charge in the absence of this subsection, such state bank . . . may, not withstanding any state constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange or other evidence of debt, interest at a rate of not more than . . . the rate allowed by the laws of the state, territory, or district where the bank is located.

The Naeems agree that the federal banking laws permit federally insured state-chartered institutional lenders such as Fremont (12 U.S.C. § 1831d), national banks (12 U.S.C. § 85), federally insured savings and loans (12 U.S.C. § 730g(a)) and federally insured credit unions (12 U.S.C. § 1785) to export their home state's interest rates to other states even if those rates are usurious and unlawful under the laws of those other states. The banking statutes accomplish this

"exportation" by preempting the usury laws of those states. The original preemption statute is 12 U.S.C. § 85, pertaining to national banks. The remaining three, pertaining to federally insured state-chartered institutions, savings and loans, and credit unions, enacted as part of DIDMCA, were modeled after § 85, and integration of § 85 has been applied to the other statutes. See Greenwood Trust Co. v. Mass., 971 F.2d 818, 831 (1st Cir. 1992). Therefore, the Naeems agree that if Fremont meets § 521 requirements, it can export California's interest laws to Illinois.

Section 521 allows use of the interest rates allowed by the law of the state where the bank is located. The Naeems have alleged that Fremont is located in Illinois "in that it maintained an Illinois loan office." Additionally, the Naeems allege that Miller submitted the $20,000 loan application to Fremont's Chicago office. Therefore, according to the Naeems, because Fremont is located in Illinois, it cannot export California law and Illinois usury law applies.

Fremont admits that it maintains an office in Illinois, but argues that an office is insufficient to establish an exception to § 521 preemption. Neither party has submitted any judicial authority directly interpreting the meaning of the term "located" as used in § 521. In Marquette National Bank v. First Omaha Serv. Corp., 439 U.S. 299 (1978), the Court held that a national bank was "located," for purposes of § 85, in the state designated in its organization certificate. One year earlier, in Citizens & Southern National Bank v. Bogas, 434 U.S. 35 (1977), the Court held that for purposes of the National Bank Act's venue provision, 12 U.S.C. § 94, a national bank was located in any state in which it maintained a branch. The Seventh Circuit has held that the meaning of the term "located" in § 94 is the same as in § 85. From these cases, the court concludes (and the parties appear to agree) that for purposes of § 521, a bank is "located" in its home state and any state in which it has a branch.

What constitutes a branch is an involved question. The Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. 103-328, 108 Stat. 2338 (1994), which allowed national and state-chartered banks to open interstate branches, defines the term (12 U.S.C. § 1813(o)):

> The term "domestic branch" includes any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State . . . at which deposits are received or checks paid or money lent.

The amended cross-claim does not specifically allege that Fremont maintained a "branch" in Illinois. In their brief, the Naeems state (p. 5 n.6) that Fremont's Chicago office made the loan, but the cross-claim contains no such allegation. The closest the cross-claim comes is the allegation that Miller submitted the application to Fremont's Chicago office.

In response, Fremont argues that the Naeems have not and cannot allege that Fremont maintains a "branch" in Illinois. It cites to Interpretive Letter No. 822 of the Office of the Comptroller of the Currency ("OCC 822"), which concludes that a bank can be considered to be located for purposes of § 85 in a state in which it has a branch. It then concludes that it is the office of the bank or branch making the loan that determines which state law applies. Finally, the Letter sets forth the test to be used to determine if the host state office should be considered a branch making the loan (Id. at 9):

> [I]f a branch or branches in a particular host state approves the loan, extends the credit, and disperses the proceeds to a customer, congress contemplated application of the usury laws of that state regardless of the state of residence of the borrower.

All three of the "non-ministerial functions" must occur at the host state branch for the loan to be considered made in that host state. Id.

On May 13, 1998, the FDIC issued General Counsel Opinion No. 11, Interstate Charges By Interstate State Banks, ("GCO No. 11") interpreting § 521 (12 U.S.C. § 1831d). GCO No. 11 essentially adopts the "non-ministerial function" test set out in OCC 822 with respect to the determination of which state's interest charges apply. GCO No. 11 provides (p.6):

> If an out-of-state branch or branches of an Interstate State Bank in a single host state performs all the non-ministerial functions (approval of an extension of credit, extension of the credit, and dispersal of loan proceeds to a customer) related to a loan, it "makes" the loan to the customer for the purposes of the Interstate Banking Statutes and the loan shall be governed by the usury provisions of the host state. If the three non-ministerial functions occur in different states or if some of the non-ministerial functions occur in an office that is not considered to be the home office or branch of the bank, the home state rates may be used.

Under GCO No. 11, only if Fremont's Illinois office performed all three non-ministerial functions would Fremont be subject to Illinois usury law. The Naeems' cross-claim does not allege that Fremont performed any of these acts in Illinois, only that Miller submitted the loan application to the Illinois office. Fremont correctly argues that the closing documents attached to and made a part of the cross-claim indicate Fremont's California office as the lender and that final approval and disbursement came from California. Accordingly, the court concludes that the Naeems have failed to allege that Fremont had a branch office in Illinois that made the loan in question. Therefore, the Naeems Interest Act claims are preempted by § 521.[5]

Finally, the Naeems argue that even if California interest rates apply, interest does not include prepaid fees and charges that exceed 3% of a loan with an interest rate greater than 8%.

---

[5] The Naeems argue that Illinois law applies because the mortgages contain a choice of law provision indicating that the security interest will be governed by federal law and the law of the jurisdiction in which the property is located. Under federal law, however, Illinois usury law is preempted. See Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 157 (1982); Gavey Properties/762 v. First Financial Savings and Loan Association, 845 F.2d 519 (5th Cir. 1988).

The cross-claim makes no mention of prepaid fees and charges, however, alleging that the Naeems paid excessive finance charges and points, which are not excluded from the definition of interest in 12 C.F.R. § 7.9001. Moreover, as Fremont asserts, the Illinois Interest Act excludes such charges from the definition of charges that can not exceed 3% of the loan. 815 ILCS 205/4.1a.

Accordingly, the court concludes that the Naeems have failed to state a claim under the Illinois Interest Act. Fremont's motion to dismiss Counts VI and VII of the cross-claim is granted.

II.  MorEquity

A.  Quiet Title

In Count I of the amended counterclaim, the Naeems allege against MorEquity a claim to quiet title to remove the cloud on the title caused by the recording of the allegedly forged quitclaim deed. MorEquity has moved to dismiss, arguing that the court lacks subject matter jurisdiction, the count fails to name necessary parties, and fails to state a claim.

In the counterclaim, the Naeems allege that the court has jurisdiction to hear the quiet title action pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367, because the quiet title action is so related to the foreclosure action that it forms part of the same case or controversy. MorEquity disagrees, but fails to state why. Obviously, the quiet title action arises out of the same core of operative facts as the foreclosure action and the Naeems' defenses to that action. Accordingly, the court accepts supplemental jurisdiction over the Naeems' claim.

Next, MorEquity argues that the Naeems have failed to name necessary parties because the counterclaim has not named the United States and Prairie Village Townhome Association.

According to MorEquity, the United States and Prairie Village are named as defendants in the cross-claim against Fremont, but the Naeems have not incorporated that pleading by reference into the counterclaim. Paragraph 81 of the counterclaim references the cross-claim and that the quiet title count in the cross-claim names Fremont, Prairie Village and the United States. Although paragraph 81 does not specifically adopt the cross-claim, it was obviously intended to do so, and both the United States and Prairie Village are already parties to this action. Accordingly, the court rejects MorEquity's argument that the quiet title count must be dismissed for failure to name necessary and indispensable parties.

Finally, MorEquity argues that the Naeems have an adequate remedy at law and that they cannot void the mortgages in a quiet title action. As noted in Part I. A. above, the cross-claim (which is virtually identical to the counterclaim) states a claim for quiet title. The appropriateness of the relief requested can be addressed when and if the Naeems prevail. Accordingly, MorEquity's motion to dismiss Count I of the counterclaim is denied.

B. <u>Counts II and III - TILA</u>

In Counts II and III, the Naeems allege that MorEquity violated TILA based on loan splitting. In Section I. C. above, the court held that the Naeems had failed to allege loan splitting by Fremont. Count II of the counterclaim is dismissed for the same reasons. Because the Naeems have no loan splitting claim they are disqualified from acting as class representatives in Count III. Therefore, Count III is dismissed.

C. <u>Count IV - TILA</u>

In Count IV, the Naeems allege that MorEquity, as assignee of the $105,000 loan, is liable for Fremont's failure to provide certain disclosures to Sally Naeem allegedly required

under TILA. 15 U.S.C. § 1638(a).[6] MorEquity has moved to dismiss for failure to state a claim, arguing that as the only person obligated on the loan, Abdul was the only person entitled to disclosures.

TILA "has the broad purpose of promoting 'informed use of credit' by assuring 'meaningful disclosure of credit terms to consumers.'" Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601). Congress has delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce and credit. Id. at 559-60. Pursuant to that authority the Board issued a set of regulations (12 C.F.R. Part 226) commonly known as Reg. Z, which sets forth detailed and sometimes confusing disclosure requirements to be made to consumers. Reg. Z pays particular attention to transactions that result in consumers giving a secured interest in their principal dwelling. See § 226.2.

Under Reg. Z § 226.2(a) (11), consumer is defined as a card holder or a natural person to whom consumer credit is offered or extended. "However, for purposes of recission under §§ 226.15 and 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership interest in the dwelling is or would be subject to the security interest." Id. Generally, if a transaction involves more than one consumer, the disclosures may be made to any consumer who is primarily liable on the obligation. "If the transaction is rescindable under § 226.23, however, the disclosure shall be made to each consumer who has a right to rescind." 12 C.F.R. § 226.17(b).

---

[6]The Naeems did not assert any such claim against Fremont, presumably because of statute of limitations problems.

24

Under § 226.23(a)(1), "in any credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have a right to rescind the transaction . . .." Therefore, if Sally had an ownership interest in the home, she had a right to rescind the Fremont transaction under § 226.23 and, therefore, was entitled to separate disclosures under § 226.17(d).

Of course, the allegations of the complaint indicate that as part of the transaction, Sally was to quitclaim her interest in the dwelling to Abdul, which would have eliminated her right to recission under § 226.23 and separate disclosures under § 226.17. The Naeems allege that Sally never signed the quitclaim deed, however, leaving her with an interest in the property and a right to receive disclosure statements from Fremont.

MorEquity did not make the loan, however, having purchased it from Fremont on December 22, 1997. Under 15 U.S.C. § 1641(a), any action which can be brought against the original creditor may be maintained against an assignee "only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement." The Naeems allege that the lack of disclosures to Sally was apparent on the face of the disclosures and other documents, making MorEquity liable for Fremont's failures.

Unfortunately for the Naeems, their factual allegations defeat their legal conclusions. According to the cross-claim, the quitclaim deed, dated October 15, 1997, (albeit forged) was recorded on November 3, 1997, as Document No. R97-167161. The mortgage purchased by Morequity was recorded the same day, November 3, 1997, as Document No. R97-167162. Thus, at the time MorEquity purchased the mortgage, the documents indicated that all persons with an interest in the dwelling had received disclosure statements. Any right Sally has to disclosure is

based on the forged quitclaim deed, and was not apparent at the time MorEquity purchased the mortgage. Therefore, Count IV is dismissed for failure to state a claim under 15 U.S.C. § 1641(a).

### D. Count V - RESPA

In Count V, the Naeems claim that MorEquity violated RESPA, 12 U.S.C. § 2605(e), by failing to respond to a qualified written request for information regarding the $105,000 loan. MorEquity has moved to dismiss the count for failure to state a claim, arguing 1) that RESPA does not apply to subordinate loans, and 2) the request was improper.

RESPA's principle purpose is to protect home buyers from material non-disclosures in settlement statements and abusive practices in the settlement process. Cortez v. Keystone Bank, 2000 WL 536666 (E.D. Pa. May 2, 2000). RESPA applies not only to the actual settlement process, however, but also to the servicing of federally regulated mortgage loans. Id. Federally regulated mortgage loans include any loans secured by a first or subordinate lien on residential real property. 12 U.S.C. § 2602(1)(A).

The RESPA provision upon which the Naeems base their claim, 12 U.S.C. § 2605(a)(1)(A) provides:

> If any servicer of a federally regulated mortgage loan receives a qualified request from the borrower (or an agent) for information relating to the servicing of such loans, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days unless the action requested is taken within such period.[7]

---

[7]Reg. X, which implements RESPA, is more restrictive. Under 24 C.F.R. 3500.21(e)(1), (e)(3), only servicers of a mortgage servicing loan must respond to a qualified written request. A mortgage servicing loan means a federally regulated mortgage loan when the loan is secured by a first lien. Because the $105,000 loan was secured by a second lien, MorEquity would not be required to respond to the Naeems' request under Reg. X. Because the court concludes that the

Servicing is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in § 10, and making the payments of principle and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

The counterclaim alleges that on April 14, 1998, the Naeems, through counsel, sent a qualified written request to MorEquity for information relating to their loan, and that MorEquity failed to respond within 60 days as required by § 2605(e). None of the irregularities alleged in the counterclaim, however, relate in any way to the "servicing" of the loan, as that term is defined in the statute. The counterclaim alleges a forged deed, and irregularities with respect to the recording of the two loans, but makes no claim with respect to improper servicing. There are no claims, for example, that MorEquity did not give the Naeems credit for any periodic payments made, which is how the statute defines servicing. According to the allegations of the counterclaim, the letter sought information about the validity of the loan and mortgage documents, but made no inquiry as to the status of the Naeem account balance. Therefore, the request did not relate to "servicing" of the loan, and Count V fails to state a claim under § 2605. Accordingly, the motion to dismiss Count V is granted.

---

Naeems' request did not relate to servicing, it need not decide whether Reg. X is ineffective because it conflicts with the statute. See Cortez, 2000 WL 536666 at *11.

E. <u>Counts VI and VII - Illinois Interest Act</u>

Counts VI and VII of the counterclaim allege the same Interest Act violations as asserted in the cross-claim against Fremont. Count VII and VIII are dismissed for the reasons set forth in Section I D above.

III.   <u>Land Title Group and Buczkowski</u>

In the amended third party complaint, the Naeems charge Land Title and Buczkowski with slander of title, fraud, breach of fiduciary duty, negligence and violating the Illinois Notary Public Act. In its January 12, 2000, order the court dismissed these claims as not properly brought pursuant to Fed. R. Civ. P. 14, because they are not dependent on or secondary to MorEquity's foreclosure claims against the Naeems. The court explained how the Naeems could bring the claim as part of the cross-claim against Fremont and gave the Naeems leave to do so. Instead, the Naeems elected to refile the third party complaint. The claims brought in the amended third party complaint are still not secondary to or dependent upon MorEquity's claims against the Naeems. The claims brought in the third party complaint stand on their own, without reference to the foreclosure claims. Therefore, they are not properly brought in a third party action. Accordingly, Land Title's and Buczkowski's motion to dismiss the third party complaint is granted.

<u>Conclusion</u>

For the reasons set forth above, Fremont's motion to dismiss the cross-claim is granted as to Counts II through VII and is denied as to Count I. MorEquity's motion to dismiss the counterclaim is granted as to Counts II, III, V, VI, and VII and denied as to Counts I and IV.

Land Title's and Buczkowski's motion to dismiss the third party complaint is granted in its entirety.

**ENTER:**     **October 20, 2000**

Robert W. Gettleman
United States District Judge